# In the United States Court of Federal Claims

No. 14-250 C

(Filed December 21, 2015)

**UNPUBLISHED**

```
* * * * * * * * * * * * * * * * * * * *
CALIFORNIA RIDGE WIND           *
ENERGY LLC and                  *
INVENERGY WIND LLC,             *
                                *
            Plaintiffs,         *      Motion to Compel; Information
                                *      Sought Is Both Irrelevant and
        v.                      *      Burdensome to Produce.
                                *
THE UNITED STATES,              *
                                *
            Defendant.          *
* * * * * * * * * * * * * * * * * * * *
```

*John C. Hayes, Jr.*, Washington, DC, for plaintiffs.[1]  *Alycia A. Ziarno* and *Brian P. Donnelly*, Washington, DC, of counsel.

*Miranda Bureau*, United States Department of Justice Tax Division, with whom were *Caroline D. Ciraolo*, Acting Assistant Attorney General, *David I. Pincus*, Chief, *G. Robson Stewart*, Assistant Chief, *Blaine G. Saito*, Trial Attorney, Washington, DC, for defendant.

---

**OPINION**

---

**Bush**, *Senior Judge*.

---

[1]/ At the time plaintiff's motion to compel was filed, Invenergy Wind LLC had not been added as a co-plaintiff.  Thus, the court's reference to a singular plaintiff in this opinion is to California Ridge Wind Energy LLC.

The court has before it plaintiff's motion to compel responses to interrogatories, filed September 30, 2015. Part of plaintiff's motion was withdrawn after the government amended certain interrogatory answers. Pl.'s Reply at 1. The remaining portion of plaintiff's motion is opposed by defendant. For the reasons stated below, plaintiff's motion is denied.

The action that gave rise to this suit is the government's determination that plaintiff should receive less than it requested in a federal grant for having developed a wind power facility. The complaint seeks "$9,158,983 in additional payments under Section 1603 of the American Recovery and Reinvestment [Act of 2009], Pub. L. 111-5 (2009), as amended by § 707 of the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, Pub. L. 111-312 (2010) ('Section 1603')." Def.'s Opp. at 2. It is undisputed that Section 1603 grants, pursuant to the statute, should vary in amount in order to account for the cost basis of the particular wind power facility. Compl. ¶ 10. According to the parties, at least one of the elements of the "claimed eligible" cost basis of plaintiff's facility is a "development fee" of $50,000,000 paid to the parent corporation of plaintiff. Pl.'s Mot. at 1; Def.'s Opp. at 3.

The court notes at the outset that this is the second discovery dispute brought to the court's attention by the parties, and yet another motion regarding a discovery dispute has recently been docketed in the companion case, *Bishop Hill Energy LLC v. United States*, No. 14-251C. Also pending before the court are fully-briefed opposed motions to amend the discovery schedule in these companion cases. The court strongly encourages the parties to work harder on achieving consensus or compromise regarding discovery matters. These companion cases have already consumed a disproportionate amount of judicial resources and the court must allocate its resources among all of the cases on its docket going forward.

In any event, the court's analysis in this opinion addresses three principal disputes: (1) whether the government's data concerning unrelated wind power projects and their grant applications and payments are relevant to the dispute over the amount of plaintiff's grant in this case; (2) whether the type and amount of information sought by means of plaintiff's interrogatories is overly burdensome on the government; and, (3) whether the discovery requested of plaintiff (or related

2

entities) regarding companies affiliated with plaintiff, previously approved by the court, is of the same nature as the discovery requested of the government that is the subject of plaintiff's motion to compel. The court's discussion of this last issue should help the parties to collaboratively resolve defendant's motion filed on November 25, 2015 in Case No. 14-251C. The court begins with the issue of relevance.

## I.    Relevance

The tax provision underlying this suit requires a determination of the cost basis of wind power facilities by the United States Department of the Treasury (Treasury) before a grant can issue. Compl. ¶ 11. Logically, Treasury's determination of the cost basis of a particular wind power facility is a fact-specific inquiry which depends, to a great degree, on the accounting data provided to Treasury by the grant applicant. *See id.* ¶ 14 (noting that affiliated companies of plaintiff submitted grant applications in which, "[i]n accordance with well established tax principles, the full cost of development [for energy production facilities] was claimed as the cost basis for each facility"). The court's task in this suit is similar; the court must determine whether plaintiff has met its burden to show that its cost basis was greater than the cost basis determined by Treasury. The parties agree that this is a *de novo* inquiry. Def.'s Opp. at 3 (citing *W.E. Partners II, LLC v. United States*, 119 Fed. Cl. 684, 690 (2015), *appeal docketed*, No. 15-5054 (Fed. Cir. Feb. 13, 2015)); Pl.'s Mot. at 8.

The parties strongly disagree, however, as to whether data collected by Treasury regarding approximately 108 other wind power facilities are relevant to the court's inquiry in this suit. The data sought by plaintiff include project information, such as the date of each wind facility's Section 1603 application and the energy output of that facility. Pl.'s Mot. App. at 30-31. Plaintiff is also interested in learning the size of "development fees" that these other wind facility projects have paid, and the extent to which such development fees were determined by Treasury to be reasonable. *Id.* App. at 31. Before turning to the parties' specific arguments regarding the relevance of the information sought by plaintiff's interrogatories, the court reviews pertinent jurisprudence in tax suits which discusses the relevance, or the lack of relevance, of prior determinations of Treasury as to the tax liabilities of similarly situated taxpayers.

### A. *De Novo* Proceedings in Tax Cases

When this court adjudicates a tax dispute, past treatment of similarly situated taxpayers by Treasury is not, as a general rule, relevant to the court's resolution of the tax dispute before it. *W.E. Partners*, 199 Fed. Cl. at 692 (citing *Vons Cos. v. United States*, 51 Fed. Cl. 1, 10 & n.10 (2001), *modified in part by Vons Cos. v. United States*, No. 00-234T, 2001 WL 1555306 (Fed. Cl. Nov. 30, 2001)). In the court's view, award decisions by Treasury on Section 1603 grant applications are analogous to private letter rulings issued by Treasury to a particular taxpayer. The substance of such communications with an individual taxpayer unrelated to the plaintiff has no relevance to a tax case before this court. *See, e.g.*, *Amergen Energy Co., LLC ex rel. Exelon Generation Co., LLC v. United States*, 94 Fed. Cl. 413, 423 (2010) ("None of these cases [cited by the plaintiff] persuades the court that the [private letter rulings] in question have any relevance to the issues to be decided in this [tax] case."); *Vons*, 51 Fed. Cl. at 12 (holding that private letter rulings issued to other taxpayers may not be relied upon for their substance in a tax suit before this court); *see also Hanover Bank v. Comm'r*, 369 U.S. 672, 686 (1962) (noting that taxpayers "are not entitled to rely upon unpublished private rulings which were not issued specifically to them") (citations omitted). Thus, to the extent that plaintiff's interrogatories seek Treasury's rulings on the reasonableness of development fees paid to create other unrelated wind power projects, such information is irrelevant to the court's inquiry in this suit.

### B. Plaintiff's Relevance Arguments

Notwithstanding the weight of precedent discussed *supra*, plaintiff argues that its interrogatories regarding other wind projects, other Section 1603 applications, and other development fees claimed by applicants and/or ruled upon by Treasury are all relevant to this suit. The central thrust of plaintiff's argument is that Treasury possesses information relevant to the task of determining the "fair market value" of development fees for wind power projects, and that this relevant data must be provided to plaintiff. *See* Pl.'s Mot. at 10 (asserting that plaintiff's interrogatories "seek information that is directly relevant to the fair market value of Plaintiff's development fee, which the Government concedes is a material fact in this case"). A second purpose of the interrogatories is to permit plaintiff to impeach the government's witnesses who might opine as to the "fair market value" of wind power facility development fees in a manner inconsistent with prior

4

Treasury rulings on other Section 1603 applications.  *Id.* at 8; Pl.'s Reply at 7-9.

As for plaintiff's relevance argument which asserts that Treasury data will help establish the fair market value of development fees, plaintiff's motion offers only one case as authority for this proposition.[2]  *See* Pl.'s Mot. at 9 (citing *Vons*, 51 Fed. Cl. at 4, 15).  Plaintiff's reliance on *Vons* in its opening brief is both cursory and vague:  "the Court [in *Vons*] conducted a point-by-point examination of the plaintiff's discovery requests and ordered the Government to respond to many of them."  *Id.*  No further reference to *Vons* is supplied in plaintiff's reply brief, nor is any additional authority cited for the proposition that Treasury rulings in other tax matters may be used to establish the fair market value of development fees, or, for that matter, for establishing the cost basis of a particular investment property.

Contrary to plaintiff's view of *Vons* the court therein expressly criticized any interpretation of governing caselaw which would support "pervasive discovery and use of private letter rulings and other information in the IRS's files to demonstrate unequal treatment among taxpayers."  51 Fed. Cl. at 10 n.10 (citation omitted).  The *Vons* court went on to cite with approval a decision of the United States Tax Court which held that "'[i]t has long been the position of this Court that our responsibility is to apply the law to the facts of the case before us and determine the tax liability of the parties before us; how the Commissioner may have treated other taxpayers has generally been considered irrelevant in making that determination.'"  *Id.* (quoting *Davis v. Comm'r*, 65 T.C. 1014, 1022, 1976 WL 3750 (1976)).  The holding in *Vons* regarding private letter rulings (PLRs) of Treasury has been summarized by this court in the following statement of the law: "[T]he substance of the PLRs issued to [other taxpayers is] a use of PLRs not condoned by *Vons*."  *Amergen*, 94 Fed. Cl. at 424.  The court cannot therefore read

---

[2]/  Plaintiff also cites to RCFC 26(b)(1) and to a case which notes that the scope of discovery is broad enough to cover matters that *could* bear on an issue before the court.  Pl.'s Mot. at 8 (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).  The court acknowledges this general principle and applies it here.  *See Oppenheimer Fund*, 437 U.S. at 351 (stating that relevant discovery "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case" (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947))).  The particular discovery dispute before the court, however, implicates precedent which specifically addresses the relevance of unrelated Treasury tax rulings to a particular tax case.

*Vons* as supplying authority for the discovery that plaintiff seeks in its motion to compel.

Returning to plaintiff's proposition regarding "fair market value," both plaintiff and the government refer to the term "fair market value" when discussing how Treasury arrived at its determination of the extent to which plaintiff's development fee was properly allowable.  Plaintiff contends that "information relating to development fees claimed by other wind projects was plainly relevant to Plaintiff's claim, both as substantive evidence of the fair-market value of Plaintiff's development fee and to impeach Treasury's credibility in the event it offers inconsistent evidence or testimony at trial."  Pl.'s Mot. at 4.  Plaintiff goes on to assert that Treasury has publicly acknowledged that it uses data from other Section 1603 applicants in evaluating the fair market values of properties that are the subject of Section 1603 applications.  Pl.'s Reply at 4.  Plaintiff then makes the leap that "it is hard to think of any facts more relevant to the fair market value of Plaintiff's development fee than the development fees charged by similarly situated players in the wind energy market."  *Id.*  Plaintiff, however, compares apples to oranges.

As reflected in the government document upon which plaintiff relies, "Evaluating Cost Basis for Solar Photovoltaic Properties," Pl.'s Mot. Ex. H, the context in which "fair market value" is referenced relates to the agency's determination of an applicant's claimed cost basis:

> The review of applications for payment under the Section 1603 program includes a determination as to whether the applicant has properly represented and calculated its cost basis.  Each application is evaluated to determine whether the cost basis includes only eligible items and that it represents the applicant's actual costs or, in certain cases, fair market value for the eligible property.

Pl.'s Mot. App. at 61.  The document further provides:

> As described in various Internal Revenue Service (IRS) publications, basis is the amount of a business'

6

investment in property for tax purposes.  Basis is
generally the cost of the property and may also include
the capitalized portion of certain other costs related to
buying or producing the property (e.g. permitting,
engineering, and interest during construction).  However,
as described in Bryant v. Commissioner of Internal
Revenue (790 F.2d 1463), "the courts have determined
that in certain circumstances, a taxpayer's stated cost for
an asset does not reflect the true economic cost of that
asset to the taxpayer and will be ignored for purposes of
determining the basis of the asset."  For example, a
stated cost may be inconsistent with the eligible
property's true basis "where a transaction is not
conducted at arm's-length by two economically
self-interested parties or where a transaction is based
upon 'peculiar circumstances' which influence the
purchaser to agree to a price in excess of the property's
fair market value."

In order to ensure that a Section 1603 applicant's
claimed cost basis reflects the eligible property's fair
market value, basis is more closely scrutinized in cases
involving related parties, related transactions, or other
unusual circumstances.

*Id.* (footnotes omitted).

As stated in the quoted passage above, where a section 1603 payment
application involves related party considerations (as in the instant case), the
agency's review of the applicant's claimed cost basis may include an assessment
of the fair market value of the eligible property.  Additionally, the document goes
on to state:

Common examples of related party or other unusual
circumstances include:

1.  Owner/applicant is related to the

7

developer, installer, or supplier (collectively referred to as the "developer").  The developer may be a separate, legally-organized business, but there is common ownership/control.

2.  Owner/applicant is a party to one or more related transactions with the developer such that economic interests in the specific transaction determining basis may not be adverse.  For example, the owner/applicant purchased the energy property from the developer and leased the property back to the developer.

Where such circumstances are present, the review team evaluates whether the claimed basis is consistent with the property's fair market value.  As one aspect of this evaluation, where related transactions or other unusual circumstances are present, the review team will consider the applicant's allocation of the cost to the eligible property, relative to other ineligible assets, rights, or contracts that may have been explicitly or implicitly conveyed in the transaction(s).  In this context, the owner/applicant may be asked to submit a more detailed cost breakdown.  Specifically, original manufacturer's invoices/costs to the developer should be provided for major equipment, subsequent markups by the developer should be enumerated, and any markups by the owner identified.  The owner may also submit a detailed and credible third-party appraisal . . . demonstrating that the claimed basis is consistent with a market transaction between unrelated parties with adverse economic interests.

*Id.* at 63 (footnote omitted).

8

It is clear that any analysis of "fair market value" in the context of determining whether plaintiff's Section 1603 payment application was properly granted revolves around the issue of whether in examining the cost basis of an applicant's property there were any related party or arms-length transaction concerns. It is also clear that any fair market value analyses performed in relation thereto would entail an examination of the fair market value of the *property* concerned. There is no indication that Treasury would attempt a meta-analysis of other Section 1603 applicants' development fee request information in order to determine the fair market value of a particular energy property.

The court notes, too, that the mass of data regarding development fees which Treasury has accepted as proper for use in establishing cost basis is irrelevant to the court's analysis here. This is a *de novo* proceeding – the rationality of Treasury's ruling on plaintiff's Section 1603 application, as well as the rationality of its rulings on other unrelated Section 1603 applications, are beyond the scope of plaintiff's burden of proof or the government's obligations as defendant in this suit. Plaintiff, for example, cannot rely on these rulings as a measure of its proper cost basis. *See, e.g.*, *Fla. Power & Light Co. v. United States*, 56 Fed. Cl. 328, 334 (2003) (stating that a tax "plaintiff cannot claim entitlement to a particular tax treatment on the basis of a ruling issued to another taxpayer" (citing *Hanover Bank*, 369 U.S. at 686)), *aff'd*, 375 F.3d 1119 (Fed. Cir. 2004). Nor can the government claim that Treasury's practice of accepting a certain level of development fees as reasonable should guide the court's interpretation of the statute in this case. The parties' arguments on cost basis must rely on facts relevant to plaintiff's Section 1603 application to be persuasive. Plaintiff has failed to show how Treasury's files regarding other Section 1603 applications are relevant or even potentially relevant to this inquiry.[3]

Turning now to the question of impeachment, plaintiff has not cited any authority for the proposition that prior Treasury rulings are discoverable for the

---

[3]/ Plaintiff's complaint underscores the irrelevance of Treasury rulings on prior Section 1603 applications. Companies affiliated with plaintiff are alleged to have received five Section 1603 grants in proportion to the cost bases claimed in the grant applications. Compl. ¶¶ 14-15. Plaintiff's grant, however, was reduced when its claimed cost basis was not allowed. *Id.* ¶¶ 19-21. Treasury's rulings on the five previous applications mentioned in the complaint have no relevance to plaintiff's claim here. Similarly, Treasury's rulings in the 108 Section 1603 applications targeted by plaintiff's motion to compel have no relevance to this suit.

purpose of impeaching future testimony from Treasury employees or experts regarding the cost basis of an investment property. Instead, plaintiff relies on two cases for the general proposition that "prior inconsistent statements" may be used to impeach the credibility of a witness. *See* Pl.'s Mot. at 8 (citing *United States v. Hale*, 422 U.S. 171, 176 (1975) and *Grand Acadian, Inc. v. United States*, 101 Fed. Cl. 398, 405 n.10 (2011)); Pl.'s Reply at 7-8 (same). Neither of these cases addresses the type of discovery dispute presented by plaintiff. *Hale* examined whether a criminal suspect's testimony could be impeached by evidence of his silence during a police interrogation. The *Grand Acadian* footnote cited by plaintiff discusses the general rule that prior inconsistent statements may be admissible at trial for the purposes of impeachment of a witness, but this footnote does not address the relevance of prior Treasury rulings in a tax case – for impeachment or for any other purpose.

Moreover, this court's examination of impeachment evidence has shown that the "prior inconsistent statements" impeachment tool does not apply when the author of the prior inconsistent statements is not the same as the testifying witness. *See Fisher v. United States*, 78 Fed. Cl. 710, 712 (2007) ("The evidentiary rules do not allow for impeachment of an expert witness by statements made by someone else that are contained in a report.") (citation omitted). Plaintiff has not established that statements regarding prior development fee allowances by Treasury would have been made by any witness that might be called in this suit. The court therefore sees no logical connection between Treasury's prior findings regarding 108 Section 1603 applications and the impeachment of government witnesses in this case.

Both of plaintiff's arguments regarding the relevance or even the potential relevance of the information sought in its interrogatories fail. The parties must necessarily focus on the specific facts of this case rather than on any alleged patterns in the disposition by Treasury of 108 Section 1603 grant applications. Because the information sought in plaintiff's interrogatories is not relevant, defendant need not provide any more specific responses to plaintiff's interrogatories than those already provided.

## II.   Unduly Burdensome Discovery

The government opposes plaintiff's motion on another ground – that full

responses to plaintiff's interrogatories would be unduly burdensome on Treasury. Plaintiff argues that relevance and burden must be weighed against each other: "[T]he Court must consider not simply whether the requests are burdensome, but whether 'the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.'"  Pl.'s Mot. at 11 (quoting RCFC 26(b)(2)(C)).  When a court has determined that the requested discovery is not relevant, however, discovery in the form of mere speculative inquiries may and should be denied by the court.  *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1326-28 (Fed. Cir. 1990).  Because the discovery sought by plaintiff is irrelevant, the burdensome nature of the discovery requested necessarily outweighs any other factors in the analysis.

Even if some of the information requested in plaintiff's interrogatories could be considered to be of tangential relevance to the cost basis issue in this suit, defendant has submitted an affidavit as to the onerous burden it would place on the government to mine 108 Section 1603 applications for the data requested by plaintiff.  *See* Def.'s Opp. Ex. C.  According to this affidavit, it would be extremely difficult to extract information regarding claimed and allowed development fees from these 108 Section 1603 applications.  *Id.* Ex. C ¶¶ 4-5. Also, according to this affidavit, Treasury would be unable to report this information in a way which would be of any value to either plaintiff or the court, due to the amount of variability in the data included in the Section 1603 applications for the various wind power facilities.  *Id.* Ex. C. ¶¶ 6-9.  Plaintiff responds that certain categories of information in the applications are easier to compile than others, and that the variations in accounting categories among the wind power facility applications should not absolve the government from responding to plaintiff's interrogatories.  Pl.'s Reply at 3-7.  Having considered both parties' arguments as to the burden imposed by plaintiff's interrogatories, the court concludes that the burden on the government significantly outweighs the potential utility of that information in developing any relevant or potentially relevant arguments that might be presented in this case.

Plaintiff also raises the issue of its own limited resources to compile "fair market value" data concerning development fees, as compared to the government's stockpile of accumulated data from Section 1603 applications.  *See*

11

Pl.'s Mot. at 12 ("To allow the Government to have possession and use of [information which concerns the fair market value of plaintiff's development fee] while prohibiting the Plaintiff from doing the same would be fundamentally unfair and violate the letter and spirit of RCFC 26."); Pl.'s Reply at 3 ("Even after needlessly expending resources investigating hundreds of public sources, therefore, Plaintiff still would not have access to the same information that is readily available to Defendant."). Although it is certainly true that the government possesses 108 confidential Section 1603 applications and plaintiff is not in that same position, the noted "imbalance" in access to data is, in this court's view, a red herring.[4] The cost basis of plaintiff's wind power facility will be established by the evidence presented by the parties which relates specifically to plaintiff's facility.[5] To the extent that "fair market value" of development fees evidence may be presented by either party in expert opinion, this court's discovery rules ensure fairness in access to data underlying expert testimony. *E.g.*, *Banks v. United States*, 75 Fed. Cl. 294, 298-99 (2007); *see* RCFC 26(a)(2). For all of these reasons, the court finds that the burden on the government is too great to require more expansive responses to plaintiff's interrogatories.

## III. Dissimilar Fact Discovery Regarding Plaintiff's Affiliated Companies

The last point to be addressed is plaintiff's contention that it would be "egregious" for defendant to be permitted extensive discovery regarding the affiliated companies of plaintiff and their wind power projects, if plaintiff is not permitted to extract similarly expansive data from Treasury's Section 1603 applications. Pl.'s Mot. at 7 n.2; *see* Pl.'s Reply at 6 ("Defendant also has insisted on . . . expensive third-party discovery from Plaintiff's parents and affiliates

---

[4] The government argues that plaintiff and its affiliated companies possess substantial amounts of information regarding development fees and investments in wind power facilities. Def.'s Opp. at 6.

[5] Plaintiff suggests that because the government allegedly relied upon data from other Section 1603 grant applications in order to determine the cost basis of plaintiff's wind power facility, that data is relevant to the issues in this suit. Pl.'s Mot. at 10; Pl.'s Reply at 4 & n.2. The court, however, does not review the government's administrative consideration of plaintiff's Section 1603 grant application in this *de novo* proceeding. The court's inquiry, instead, focuses on the evidence of the cost basis of plaintiff's wind power facility. As previously stated, the analytical framework utilized by Treasury in determining plaintiff's Section 1603 grant is not a relevant factor for determining the proper cost basis of plaintiff's wind power facility.

regarding dozens of other wind energy properties with little if any relevance to this case."). The comparison of these discovery efforts is inapposite.

One of the issues presented in this case revolves around the development fee paid by a subsidiary to a parent corporation that is involved in a great number of wind power projects. The amount of the fee and the financial investments in plaintiff's wind power project have a direct connection to the financial relationships among the affiliated companies. The relevance of these particular wind power projects and the financial relationships among those related business entities is clear.

Plaintiff, on the other hand, asks Treasury to analyze complex financial investments of companies wholly unrelated to plaintiff in order to establish some type of benchmark for the fair market value of development fees in the wind power industry. Not only is the requested analysis burdensome and unlikely to provide meaningful results, the data retrieved would not assist the court in its task of determining the cost basis of this particular wind power facility. The court's focus in this suit is not on all wind power facilities – it is on plaintiff's wind power facility.

It is neither imbalanced nor improper for the court to permit relevant discovery and to restrain irrelevant discovery. Furthermore, although plaintiff may indeed have more voluminous corporate and accounting records to produce than the documents which the government must produce, the discovery permitted defendant has not been shown to be disproportionate to the complexity of the financial relationships at issue in this cost basis dispute. The court must reject plaintiff's contention that the parties have not been permitted equivalent access to relevant or potentially relevant discovery.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff's Motion to Compel Responses to Interrogatories, filed September 30, 2015, is **DENIED**.

/s/Lynn J. Bush_____
LYNN J. BUSH
Senior Judge