# United States Court of Federal Claims

No. 14-250 C
Filed: April 24, 2019
(Reissued: June 20, 2019)

---

**CALIFORNIA RIDGE WIND ENERGY, LLC, and INVENERGY WIND, LLC,**

    *Plaintiffs,*

v.

**UNITED STATES OF AMERICA,**

    *Defendant.*

---

*John Carney Hayes, Jr., Esquire*, Nixon Peabody LLP, Washington, D.C., for plaintiffs.

*Miranda Bureau, Esquire*, United States Department of Justice, Tax Division, Washington, D.C., for defendant.

## POST-TRIAL ORDER AND OPINION

**Hodges,** *Senior Judge.*

Plaintiff California Ridge Wind Energy, LLC, filed a complaint alleging that the Department of Treasury reduced a Section 1603 cash grant improperly and that it is entitled to $9,158,983 for the shortfall. Defendant contends that a sham transaction inflated the amount claimed in plaintiff's application and subsequently filed a counterclaim to recover an overpayment of $5,635,537. We consolidated the cases and conducted trial from July 23 to July 26, 2018, in Washington, D.C.[1]

---

[1] *California Ridge Wind Energy, LLC v. United States*, C/A 1:14-cv-00250-RHH; and *Bishop Hill Energy, LLC v. United States*, C/A 1:14-cv-00251-RHH. Plaintiffs California Ridge Wind Energy, LLC, and Bishop Hill Energy, LLC, are entities owned by a parent company, Invenergy Wind, LLC. The facts, with slight variations in dates and dollar amounts, the law, and the reasoning in this Opinion are the same in both cases.

We made the following relevant conclusions during the course of trial: (1) Section 1603 permits an applicant to include a "Development Fee"[2] as a part of a wind energy project's cost basis; (2) Development Fees may increase the cash grant awarded by Treasury; (3) however, plaintiff did not substantiate the $50 million Development Fee; and (4) plaintiff is not entitled to the claimed $9,158,983 cash grant.

## BACKGROUND

Congress enacted the American Recovery and Reinvestment Act of 2009 to stimulate the struggling economy.[3] Section 1603 of the Recovery Act is a program that offers cash grants in lieu of tax credits to developers of alternative energy production facilities. Applicants "who place in service specified energy property" are eligible for payments from the Department of the Treasury, "provided certain conditions are met."

In October 2012, California Ridge placed a qualified wind facility into service at a cost of $456,196,599 and applied for a Section 1603 cash grant totaling $136,858,980. Plaintiff submitted a three-page development agreement and a document purportedly showing a "proof of payment" in support of the $50 million Development Fee. Treasury awarded plaintiff $127,699,997 and explained why it granted some, but not all, of the claimed amount:

> [T]he presented cost basis was higher than open market expectations for projects of this size and in this location and the transaction involved related parties and/or related transactions.
>
> The cost basis has been adjusted to allow for base costs plus an appropriate markup (to include reasonable overhead, profit, and, if appropriate, development fees) resulting in a total that more closely reflects the amount that would have been paid in an arms' length transaction between parties with adverse interests.

Testimony and evidence presented at trial shows that plaintiff is not entitled to a $9,158,983 shortfall, and that the Government may recover the $5,635,537 overpayment.

---

[2] Cases arising under Section 1603 tend to focus on one element of the cost basis. This dispute arose over plaintiff's calculation of a fee for development services. The term "Development Fee(s)" is capitalized in this Opinion hereinafter.
[3] Pub. L. No. 111-5, 123 Stat. 115, 364–66 (Feb. 17, 2009).

**LEGAL STANDARDS**

We have jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491 (2012). The Tucker Act establishes our jurisdiction and waives sovereign immunity over certain claims against the United States, including those founded upon the Constitution and federal statutes and regulations. *Id.* The Tucker Act "does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983); *United States v. Testan*, 424 U.S. 392, 398 (1976)). "In the parlance of Tucker Act cases, that source of law must be 'money-mandating.'" *Id.*

This court has held that Section 1603 of the Recovery Act is money-mandating and that we have jurisdiction over such disputes. *ARRA Energy Co. v. United States*, 97 Fed. Cl. 12, 19–20 (2011). The Recovery Act compels a payment by Treasury and does not provide the Government with discretion to refuse payments when the requirements of the statue are met. *Id.* at 22. That is, "while the government may decide . . . that an applicant has miscalculated or misrepresented the basis of its property, it has no discretion to reimburse an applicant for less than, or more than, thirty percent of the correct basis of the property." *Id.* at 21.

Section 1603 provides "grants for specified energy property in lieu of tax credits" and explicitly adopts the meaning of terms used in the Internal Revenue Code. When an applicant pursues an Section 45 renewable electricity production tax credit or Section 48 energy tax credit instead of a Section 1603 reimbursement and receives an unfavorable determination by the Internal Revenue Service, the applicant may file a tax refund suit.

Congress did not intend a different standard of review based on Section 1603's provision of direct reimbursement in lieu of tax credits. Accordingly, the court reviews plaintiff's claim *de novo*. *W.E. Partners II, LLC v. United States,* 119 Fed. Cl. 684, 690 (2015), *aff'd*, 636 F. App'x 796 (Fed. Cir. 2016).

**DISCUSSION**

The issue is whether plaintiff can include a Development Fee as a separate, indirect cost in its cost basis calculation. That is, whether California Ridge's $50 million Development Fee, paid to its parent company, Invenergy, LLC,[4] is an eligible cost for

---

[4] See the parties' Stipulation of Facts: C/A No. 14-250, Dkt. 98; C/A No. 14-251, Dkt. 196 (explaining differences between the closely-named entities of Invenergy, LLC; Invenergy Wind North America ("IWNA") at ¶¶ 39, 41; and Invenergy Wind Development North

-3-

developing the wind energy facility. It is plaintiff's burden to show that it is entitled to an additional Section 1603 cash grant.

Treasury receives Section 1603 applications seeking cash grants and, when the markup is supported by relevant facts and figures, adds the eligible costs to the applicants' award. The process is limited in time, generally 60 days, and limited in scope, relying on only documents submitted by an applicant.

The developers "elected to monetize their extensive work" on the wind energy projects "by charging a Development Fee to the . . . project company," and the Development Fee calculation incorporated variables such as knowledge, skill, time, effort, and other services, according to plaintiff.

Section 1603 reimburses an applicant for costs, not value, and an applicant is required to show real costs, defendant claims. Discovery resulting from plaintiff's lawsuit revealed information regarding the "proof of payment", which Treasury did not have when it awarded the cash grant. Defendant contends that the transaction is a sham.

The sham transaction doctrine applies "if a transaction either lacks objective economic substance or if it is subjectively shaped solely by tax avoidance motivations." *Stobie Creek Invs., LLC v. United States*, 82 Fed. Cl. 636, 697 (2008), *aff'd*, 608 F.3d 1366 (Fed. Cir. 2010). "[A] taxpayer must prove that its transaction was both purposeful and substantive . . . if proof in either regard is lacking, the transaction is a sham." *H.J. Heinz Co. & Subsidiaries v. United States*, 76 Fed. Cl. 570, 584 (2007).

The economic substance of a transaction "must be viewed objectively rather than subjectively." *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1356 (2006). Additionally, "the transaction to be analyzed is the one that gave rise to the alleged tax benefit . . . there is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction without a business purpose, in order to create a tax benefit (which is illegitimate)." *Id.* at 1356-57. The test is "used to deny effect to transactions designed to manufacture benefits without affecting the economic circumstances of the parties involved. It looks through the form of a transaction to its substance to determine if a real transaction has occurred." *Johnson v. United States*, 11 Cl. Ct. 17, 25 (1986).

Bank records presented at trial showed that money passed through bank accounts of several entities related to plaintiff by wire transfer and then back into the account from which it originated. These transactions raised suspicion at the Department of Justice, and in the court's mind as well. Plaintiff claims that the wire transfers represent a legitimate

---

America ("IWDNA") at ¶¶ 70, 71). (ECF No. [x] (Order amending the opinion issued on January 7, 2019).)

business method that served to memorialize the value of the development agreement.

However, plaintiff failed to show the business purpose or the economic substance of the Development Fee. Bryan Schueler, the chief development officer for Invenergy LLC, testified about Invenergy's experience developing renewable energy projects. He testified about development fees for wind energy projects in general, but did not give testimony specific related to the development services outlined in the three-page development agreement;[5] in fact, he appeared unaware of the agreement entirely:

> Q: Can you identify this document for me on the screen?
>
> A: Facility management agreement by and between Bishop Hill Energy LLC, as owner, and Invenergy Services, LLC, as manager, for the Bishop Hill Energy Project, dated November 15, 2011.
>
> Q: Did you have any role in drafting this facility management agreement?
>
> A: I don't believe I did.

(Tr. 146:2-147:4)

> Q: The development team that writes the scope of work for the balance of plant contract, they do that for all wind projects. Is that correct?
>
> A: The same team wouldn't do it for every wind projects, but it's the development team that is going to be participating in writing those scopes of work, yes.

(Tr. 160:6-11)

David Yankee, an employee of Deloitte Tax LLP, testified that the development agreement contained no quantifiable services.

> Q: And the development agreement provides a definition of development services, correct?
>
> A: Yes.
>
> Q: And there's a list of things under the definition of the development services that include negotiating construction, financing terms, negotiating

---

[5] See page 151 of the trial transcript, Tr. 151:3-20. (ECF No. 211 (Order amending the opinion filed on January 7, 2019).)

project and operational documents related to the project.

A: Yes.

Q: Okay. And Invenergy didn't quantify each of these activities described in the development agreement individually, did they?

A: Correct. They did not.

(Tr. 696:24- 697:7)

Plaintiff's claim regarding the independent certification of the Development Fee is also unpersuasive. Mr. Yankee's testimony disclosed that Invenergy management provided the information that Deloitte relied on to certify the eligible cost basis:

Q: And Deloitte relied on Invenergy to provide assurance that all of the accounting records supporting the eligible costs were valid, accurate, and complete. Is that right?

A: Yes.

Q: And it also relied on Invenergy management to assure them that the costs included in the eligible cost basis were determined in accordance with Section 1603. Is that right?

A: Yes.

Q: And Invenergy did the initial determination about how costs would be categorized. Is that right?

A: Yes.

Q: And then Deloitte & Touche tested that categorization by sampling certain costs. Is that right?

A: Yes.

Q: And so, as part of the [audit] examination, Deloitte & Touche didn't verify all costs.

A: Correct.

(Tr. 692:13-693:19)

Jonathan Malacarne, director of accounting at Invenergy, testified about Invenergy's accounting practices associated with the wind energy facilities. He described accounting journal entries that show business purposes for the transactions. However, plaintiff did not show the journal entries and, therefore, the court must rely on Mr. Malacarne's self-serving testimony alone.

In sum, plaintiff proffered: an independent certification of the Development Fee that is based on information from Invenergy management; a development agreement without quantifiable services; and a round-trip wire transfer that began and ended in the same bank account, on the same day, none of which were corroborated by independent testimony. This falls well short of the burden under the sham transaction doctrine.

What remains is the uncontested fact that plaintiff benefitted from the round-trip transaction; a higher cost basis results in an increased Section 1603 payment. The sham transaction on which the $50 million Development Fee is based lack a business purpose or economic substance. Therefore, defendant is entitled to recapture the amount of the counterclaim.

## CONCLUSION

We have seen no basis on which to award plaintiff an additional cash grant. Plaintiff did not quantify the development services and insufficient objective evidence to show the transaction is not a sham. Plaintiff also claims that a cash grant is due because Treasury approved full payments to other related entities. Not only is this a weak argument logically, plaintiff sued for additional money in this case and the court reviews these actions *de novo*. The lawsuit resulted in the discovery process that revealed the questionable origin of plaintiff's claimed Development Fee. Therefore, plaintiff's claim for reimbursement of an additional $9,158,983 cash grant is without merit.

Plaintiff California Ridge's complaint is **DISMISSED**; Defendant's counterclaim is **GRANTED**. The Clerk of Court will enter judgment for defendant in the amount of $5,635,537. No costs.

**IT IS SO ORDERED.**

s/*Robert H. Hodges, Jr.*
Robert H. Hodges, Jr.
Judge